# EXHIBIT A

```
 1              IN THE UNITED STATES DISTRICT COURT
                 SOUTHERN DISTRICT OF FLORIDA
 2
                         MIAMI DIVISION
 3
                 CASE NO:  24-mj-04544-LMR-1
 4

 5

 6

 7  UNITED STATES OF AMERICA,      )
                                   )
 8           Plaintiff,            )         December 13, 2024
    v.                             )
 9                                 )
    TAL ALEXANDER,                 )
10                                 )         Pages 1 - 77
             Defendant.            )
11  _____/

12

13

14
                       DETENTION HEARING
15
            BEFORE THE HONORABLE LISETTE M. REID
16              UNITED STATES MAGISTRATE JUDGE

17

18

19

20

21
    APPEARANCES:
22
    Counsel on behalf of the Plaintiff:
23
                 UNITED STATES DEPARTMENT OF JUSTICE
24               99 NE 4th Street
                 Miami, FL 33132
25               BY:  LAUREN A. ASTIGARRAGA, ESQ.
```

```
 1
     APPEARANCES CONTINUED:
 2

 3   Counsel on behalf of the Defendant:

 4               JOEL DENARO P.A.
                 1000 Brickell Avenue
 5               Suite 201-E,
                 Miami, FL 33131
 6               JOEL DENARO, ESQ.
                 Appearing pro hac vice
 7

 8

 9
                 WALDEN MACHT HARAN & WILLIAMS LLP
10               250 Vesey Street, 27th Floor,
                 New York, New York 10281
11               BY:  MILTON L. WILLIAMS, ESQ.
                 BY:  DEANNA M. PAUL, ESQ.
12

13

14

15   Transcribed by:

16               BONNIE JOY LEWIS, R.P.R.
                 7001 SW 13 Street
17               Pembroke Pines, FL  33023
                 954-985-8875
18               caselawrptg@gmail.com

19

20

21

22

23

24

25
```

1

2

I N D E X

3

4

THE WITNESS:                                    PAGE:

5

FBI SPECIAL AGENT JUSTINE ATWOOD

6

7

Cross Examination by Mr. Williams:              19

Redirect Examination by Ms. Astigarraga:        35

8

Recross Examination by Mr. Williams:            41

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1           (Thereupon, the following proceedings were held:)

2           THE COURT:  Okay.  The final matter on the calendar is

3   USA versus at all Alexander; Case Number 24-cr-04544.

4           MS. ASTIGARRAGA:  Good afternoon, Your Honor.  Lauren

5   Astigarraga on behalf of the United States.

6           MR. DENARO:  Good afternoon, Your Honor.  Joel Denaro

7   on behalf of Tal Alexander.

8           As the Court is aware, I filed a temporary notice of

9   appearance as well as a motion *pro hac vice* and the Court

10  granted that motion.

11          Thank you.

12          THE COURT:  Yes.

13          MR. DENARO:  So it is a pleasure to introduce Deanna

14  Paul from the Southern District of New York as well as Mr.

15  Milton Williams from the Southern District of New York.

16          Very fine lawyers, Your Honor.  They are going to be

17  handling the detention hearing.

18          THE COURT:  Okay.

19          MR. DENARO:  But I just wanted to personally introduce

20  them to the Court.

21          THE COURT:  All right.  Thank you, Mr. Denaro.

22          MR. WILLIAMS:  Good afternoon, Your Honor.

23          THE COURT:  Good afternoon.

24          MR. WILLIAMS:  Pleasure to appear in front of you and

25  thank you for granting *pro hac vice*.

```
 1              THE COURT:  Very good.
 2              So let's start with pretrial detention and Government
 3    how do you wish to proceed?
 4              MS. ASTIGARRAGA:  Factual proffer, Your Honor.  We
 5    have an agent who is also present.
 6              THE COURT:  Okay.  All right.  So we will let the
 7    Government proceed with the factual proffer.
 8              Then, Mr. Williams, if you want to question the agent,
 9    we will give you the opportunity to do so.
10              MR. WILLIAMS:  Thank you, Your Honor.
11              May I ask, two things, is it possible to get the 3500
12    material from the AUSA after the agent testifies?
13              MS. ASTIGARRAGA:  I could ask the prosecution in the
14    Southern District of New York.  They requested the information
15    five minutes before the hearing.  I explained that we couldn't
16    produce that at this time.
17              I anticipate they have no issue presenting *Jencks*
18    following the conclusion of the hearing when they have an
19    opportunity to assemble it.
20              MR. WILLIAMS:  Okay.
21              THE COURT:  Yes.
22              MR. WILLIAMS:  And should the hearing be continued,
23    then, Your Honor, in case there is something in the materials
24    that I would like to question on.
25              THE COURT:  Well, generally we don't do that because
```

1  you have one opportunity for the hearing.

2        MR. WILLIAMS:  Okay.

3        THE COURT:  But definitely there is something in there

4  that you believe that it should have been considered, you have

5  the opportunity to appeal my decision.

6        MR. WILLIAMS:  Thank you, Your Honor.

7        THE COURT:  And bring that to the District Court's

8  attention.

9        MR. WILLIAMS:  Thank you very much, Your Honor.

10       THE COURT:  Okay.

11       MS. ASTIGARRAGA:  May I proceed, Judge?

12       THE COURT:  Yes, you may.

13       MS. ASTIGARRAGA:  Thank you, Your Honor.

14       The Government notes that the presumption applies in

15  this case and it is joining in the recommendation of Pretrial

16  Services that no combination of conditions is appropriate and

17  that detention should be ordered.

18       The evidence in the Government's case demonstrates

19  that from at least 2010 to 2021, the Defendant, his brothers

20  who are charged as his co-defendants, all conspired together to

21  sexually assault, traffic, and forcibly and violently rape

22  dozens of women.

23       Multiple of those women include women who were minors

24  at the time they were assaulted.  While the conspiracy charged

25  here is an eleven-year span, the evidence in this case supports

1  that the conduct has been ongoing for approximately 20 years.

2          This conduct also transpired during a period where the

3  Defendant and his brothers were in serious or long-term

4  relationships.

5          The offenses that the Defendant has been charged with

6  each carry a 15-year minimum mandatory.  However, their

7  estimated guideline range is life imprisonment.

8          While the indictment substantively charges two

9  particular victims, the conspiracy charged includes that the

10  Defendant and his co-Defendant engaged in this type of conduct

11  against at least approximately 40 different victims.

12          All of these victims name at least one of the

13  Alexander brothers.  Since the Defendant's arrest became public

14  this week, numerous other potential victims have since come

15  forward to report being sexually assaulted by the Defendant or

16  one of his brothers who received a bond, but are also charged

17  in this indictment and are pending their transfer over here

18  into federal court.

19          Evidence from this investigation shows that the

20  Alexander brothers began engaging in these acts of sexual

21  violence, including gang rapes, while they were still in high

22  school here in Miami, Florida.

23          The Government interviewed multiple women who report

24  being raped by at least one of the Alexander brothers,

25  including the Defendant, in high school.  They claim that this

1  was done in a gang rape style form by the brothers and other
2  people.
3          The victim reported the Defendant boasted the sexual
4  assaults at school proclaiming that he had been, quote, running
5  train on their victims and saying that he wanted to do it
6  again.
7          The phrase running a train is a phrase known to law
8  enforcement to mean having sex with multiple people, usually
9  men, to have sex with a single person, usually a woman.
10  Running a train can also be a phrase that means gang rape.
11          Law enforcement learned through public reporting that
12  one of the Defendant's brothers charged in this case, published
13  in his high school yearbook that his most memorable moment in
14  high school was, quote, riding my first choo-choo train, end
15  quote.
16          As adults, the Defendant and his brothers serial
17  sexual violence has only escalated over the past decade.  This
18  investigation has uncovered that the Defendant and his brothers
19  would find female victims through a variety of means, which
20  included through the use of promoters to bring them women
21  through dating apps and through chance encounters.
22          However, the evidence in the Government's case shows
23  that the subsequent conduct that all followed was fairly
24  consistent in their MO and in their pattern of sexual violence.
25          The Defendant and his brothers would invite the

1    victims to parties or events luring them over with travel to

2    popular vacation destinations such as the Hamptons, Tulum in

3    Miami, or to other luxury accommodations at lavish hotels or

4    properties.

5          They would offer them alcohol laced with drugs in

6    order to physically incapacitate them and then they would

7    forcibly rape the victims either alone, together with other

8    co-Defendants, or with other uncharged co-conspirators.

9          Many of the victims reported symptoms consistent with

10   being drugged by a date rape drug and indicated that they had

11   an inability to move and difficulty speaking, feeling like they

12   could not control their own bodies and that they had gaps in

13   their memories.

14         In drugging their victims, the Defendant and his

15   brothers used cocaine, mushrooms, and the date rape drug.  Many

16   victims also reported to law enforcement that they told the

17   Defendant, or his brothers, no, or that they even screamed

18   while the rapes were happening, but that on each and every

19   occasion the Defendant ignored their pleas to stop.

20         Many of the victims also reported being terrified the

21   bothers would hurt them or be killed because of how

22   aggressively and forcibly they were raped during the sexual

23   assaults.  Numerous victims recalled being restrained and being

24   physically held down.

25         These accounts are consistent with dozens of women who

1   have come forward to report their sexual assaults.  Despite

2   many of these victims coming from different states, social

3   circles, and the facts that the incidents occurred on different

4   dates at times spanning different decades.

5          The Defendant has also been charged for conducts

6   against two subsequently charged victims.  As it relates to

7   victim one, in the summer of 2011, victim one traveled to the

8   Hamptons at her friend's invitation.

9          Victim one and other women were met at a train station

10  by the Defendant and another man and they took the women to

11  their vacation house.

12         After arriving at the house, victim one was given a

13  glass of wine and drank about half of it before she began to

14  feel unwell in a way that was inconsistent with drinking that

15  amount.  Victim one's memory, thereafter, became hazy, but she

16  had several distinct memories of that night.

17         Specifically victim one remembers being held down by

18  the Defendant while another man entered the room.  Victim one

19  also remembers being in a second location with the Defendant

20  and another man and that a camcorder was set up.

21         Victim one's next memory is waking up in the grass

22  outside of the vacation home with a physical sensation

23  indicating recent vaginal penetration.

24         As it relates to victim two, in August of 2016, victim

25  two and her friend, who I will refer to as individual one,

1  mashed with the Defendant's brother Alon and Oren Alexander on

2  a dating application.

3           Victim two primarily communicated with Oren and victim

4  one primarily communicated with Alon.  Victim two and

5  individual one eventually traveled from Illinois to stay with

6  the Defendant's brothers in the Hamptons over the Labor Day

7  weekend.  The co-Defendants paid for the travel and

8  accommodations of victim two and individual one.

9           Messages located on Oren Alexander's iPod account

10 reflect that the Alexander brothers exchanged communications

11 with this Defendant about purchasing flights for victim two and

12 individual one around the time that the brothers booked their

13 tickets.

14          In the messages Alon indicated:

15          "Are we booking the flights?  First three on the left.

16 We split and try to orgy them out."

17          This Defendant responded:  "For sure, last weekend,

18 throw it up."

19          Alon responded:  "I agree, Oren.  To which Oren

20 responded:  "All four?  Why not."

21          Two days later this Defendant began exchanging

22 messages within another group chat entitled Hamptons Hot Chicks

23 with two party promoters.

24          At one point one of the promoters said I want photos

25 of the girls naked and this Defendant responded:

1          "LOL, guys, we're going to have a lot of fun."

2          Once victim two and individual one eventually arrived

3    to the Hamptons' home and the Defendant and his brother hosted

4    a party the following day.

5          During the party, Oren Alexander gave victim two a

6    cocktail and shortly thereafter victim two began feeling

7    strange and struggled to walk.

8          Alon Alexander assisted victim two inside the house

9    and took her into the bedroom to lie down.  Some time later

10   victim two woke up when Oren entered the room.  He then pulled

11   down victim two's bathing suit and climbed on top of her.

12   Victim two was physically impaired and could not move.

13         She also struggled to speak.  Oren raped victim two

14   and then left the room leaving her lying in the bed.

15         When victim two woke up the next morning, she was

16   lying on the bed and her bathing suit was pulled down around

17   her legs.

18         In another group, in a What's App chat called Lions in

19   Tulum.  The Alexander brothers and other men attending the trip

20   discussed, quote, imports of women to Tulum for their upcoming

21   trip that they were discussing.

22         They discussed splitting the cost of lodging and

23   flights for the women that they planned to, quote, import over

24   there.  And they discussed providing the drugs to the women so

25   that it would be more likely that they would want to engage in

1  sex.

2          In that group chat one of the participants stated,

3  quote, going to start collecting for the pot to fly bitches

4  down, end quote.

5          Alon Alexander replied, there should be a fee per bang

6  and after bang, end quote.  The Defendant later stated that the

7  girls looked fresh.

8          The chat also made clear that the Defendant and his

9  brothers wanted to be sure that only certain kind of drugs like

10  cocaine, mushrooms, and the date rape drug were present for the

11  festivities.

12          The group also discussed they did not want the girls

13  to have Ectasy because, quote:

14          "Nothing gets done with that and it just makes the

15  girls want to chase the party instead."

16          In that same group chat several days later the

17  Defendant reinitiated communication about the drugs again.

18  This time inquiring also about photographers.  The Defendant

19  asked the group:

20          "Photographers?  Drugs?"

21          To which someone responded:  "All getting worked on."

22          Male one told the group that they could feel free to

23  extend a piece that you like, which law enforcement understands

24  piece to mean a particular woman.

25          One of the Defendant's brothers stated that he wanted

1  to make sure that he got, quote:

2      "Max returns and there were no free rides under my

3  watch."

4      The Government is also in possession of social media

5  evidence that supports the charges in this indictment.

6      In January of 2024, Oren Alexander messaged this

7  Defendant and told him, quote:

8      "Start to think about your reputation that you want

9  out there.  We're on the top of our game and the only thing

10 that can bring us down is some ho complaining."

11     To which the Defendant agreed and responded:

12 "Understood.  Did someone complain?"

13     And even when victims did complain, the Defendants

14 took steps to interfere, intimidate, and stop victims from

15 reporting.

16     Prior to this case and in an instance where the victim

17 stated that she had been forcibly digitally penetrated by this

18 Defendant, while Oren was in the room, this Defendant and his

19 brother then filed a police report alleging harassment against

20 the victim.

21     This Defendant then threatened that victim with a

22 defamation lawsuit and told her that if she did not stop

23 telling people that he and Oren had sexually assaulted her that

24 he was going to file a lawsuit against her.

25     Another victim reported that the Defendant made

1   threatening statements to her after she told other people that

2   she had been drugged.

3         In March of 2024, multiple lawsuits alleging

4   misconduct and assault against the Alexander brothers were

5   publically reported.

6         In response to the public accusations, Alon Alexander

7   began compiling files on each publically identified victims,

8   several who had not been made public yet, as part of an

9   apparent attempt to discredit their accusers.

10        The Government's investigation as to this obstructive

11   conduct is still ongoing.

12        The Defendant is a multimillionaire who has the

13   resources to flee and live comfortably in hiding.  The

14   Defendant and his family have access to significant wealth.

15        He and one of his brothers owns a luxury real estate

16   brokerage with a real estate portfolio valued at hundreds of

17   millions of dollars.

18        They are known in the real estate world for selling

19   high-end luxury homes to celebrities and the ultra rich.  The

20   Defendant has properties here in Miami as well as over in New

21   York.

22        The Defendant and his family also have significant

23   foreign ties.  Particularly to Israel and to Brazil.  Their

24   parent are from Israel and the Alexander brothers frequently

25   travel to Israel to visit family, conduct business, and for

1    vacation.

2         They also travel frequently outside the United States

3    to other locations often booking flights at the last minute and

4    traveling by their private jet or on a yacht.

5         We have confirmed with OIA, who indicated that despite

6    an extradition treaty, we can not ensure the Defendant's

7    extradition back to the U.S. should he flee out to Israel.

8         This concludes the Government's proffer.  Special

9    Agent Justine Atwood is present and available for

10   cross-examination.

11        I would also like to note for the record, Your Honor,

12   that the parties have conferred and agreed not to name any

13   particular victims here at this hearing.

14        There is one additional victim that I believe counsel

15   intends to inquire on and she will be referred to as victim

16   three in this hearing.

17        THE COURT:  Okay.  Thank you very much.

18        So, Agent Attwood, if you could come forward, please.

19        You could stand at the chair by the witness stand and

20   then my courtroom deputy will swear you in and then you can

21   have a seat.

22        Mr. Williams, with respect to what we discussed

23   before, the *Jencks* --

24        MR. WILLIAMS:  Yes.

25        THE COURT:  I want to make clear, though, that there

```
 1  is a requirement in the rule that if there is some information
 2  that was not known to you at the time of the hearing, and that
 3  if it has a material bearing on the hearing, you could
 4  certainly file a motion to re-open the hearing stating what
 5  that evidence is and if it is material.
 6           I just want to clarify that.
 7           MR. WILLIAMS:  You know, Your Honor -- and I am sorry.
 8  I really appreciate you taking the time out today to do this
 9  hearing.
10           What I am saying is this.  Normally -- and this is I
11  am back from New York and practice a lot in the Southern and
12  Eastern Districts up there.
13           And normally we will get in many cases 3500 material
14  beforehand or at least at the end of the direct examination of
15  this case proffer.
16           And I appreciate it.  I don't want to delay the
17  proceedings.  I appreciate you saying and putting on the record
18  what you did.
19           And once we get it and look at it, if there is a need
20  at all, we will revisit it.
21           Thank you very much.
22           THE COURT:  Okay.  Very good.  All right.
23           THE COURTROOM DEPUTY:  Please raise your right hand.
24           THE WITNESS:  (Complied.)
25  (Witness sworn.)
```

| | |
|---|---|
| 1 | THE COURTROOM DEPUTY:  Please have a seat and state |
| 2 | your name and your last name. |
| 3 | THE WITNESS:  Yes.  Justine Attwood; A-T-W-O-O-D. |
| 4 | THE COURTROOM DEPUTY:  Thank you. |
| 5 | THE COURT:  You may proceed. |
| 6 | MR. WILLIAMS:  Thank you, Your Honor. |
| 7 | With the Court's permission and perhaps I could give |
| 8 | it to the Deputy, I would like Special Agent Atwood to have the |
| 9 | indictment and if we could mark it as Defense Exhibit One. |
| 10 | THE COURT:  Sure.  And you may have it marked and then |
| 11 | my courtroom deputy -- |
| 12 | MR. WILLIAMS:  I don't have a paperclip. |
| 13 | THE COURTROOM DEPUTY: There is one there. |
| 14 | MR. WILLIAMS:  Sure.  Absolutely. |
| 15 | THE COURTROOM DEPUTY:  Do you see them there? |
| 16 | MR. WILLIAMS:  I do.  Thank you. |
| 17 | THE COURTROOM DEPUTY:  You're welcome.  I'll put the |
| 18 | case number on it. |
| 19 | MR. WILLIAMS:  Okay.  Thanks. |
| 20 | THE COURTROOM DEPUTY:  You're welcome. |
| 21 | MR. WILLIAMS:  Is there a paperclip there by any |
| 22 | chance? |
| 23 | THE COURTROOM DEPUTY:  Sure.  This will be better. |
| 24 | MR. WILLIAMS:  Thank you very much. |
| 25 | THE COURTROOM DEPUTY:  You're welcome. |

```
 1              MR. WILLIAMS:  Here you go Agent Atwood.

 2              THE WITNESS:  Thank you.

 3         FBI S/A JUSTINE ATWOOD, GOVERNMENT'S WITNESS SWORN

 4                        CROSS EXAMINATION

 5  BY MR. WILLIAMS:

 6  Q.   Special Atwood, are you familiar with the indictment,

 7  Defense Exhibit One, chat superseding indictment in this case?

 8  A.   Yes.

 9  Q.   Are you aware of whether or not there was a previous

10  indictment?

11  A.   Yes.

12  Q.   Are you familiar with that indictment?

13  A.   Yes.

14  Q.   Did you actually see the other indictment?

15  A.   Yes.

16  Q.   Could you tell us the differences between the first

17  indictment and that indictment?

18  A.   This is a speaking indictment, the second one.

19  Q.   Meaning what?

20  A.   We added additional information to that indictment.  I was

21  not there for that indictment.

22  Q.   You were not there for which indictment?

23  A.   The second one.

24  Q.   The second one.  The one you are holding?

25  A.   Yes.
```

1  Q.  Now, how long have you been with the FBI?

2  A.  **Three and-a-half years.**

3  Q.  Three and-a-half years.

4      And what unit or Task Force are you assigned to?

5  A.  **I am assigned to the Child Exploitation and Human**

6  **Trafficking Task Force.**

7  Q.  And how long have you been working on this particular

8  matter?

9  A.  **Since the summer of 2024.**

10 Q.  Since the summer.  Approximately when in the summer?

11 A.  **In June.**

12 Q.  And are you the lead agent on the case?

13 A.  **Yes, I am.**

14 Q.  You are the lead.  So you are familiar with -- very

15 familiar with the investigation, correct?

16 A.  **Correct.**

17 Q.  Can you tell me -- and during the proffer the AUSA

18 mentioned that there was travel between somewhere to the

19 Hamptons.

20      Where did that person come from to go to the Hamptons?

21 A.  **They traveled either by bus.**

22 Q.  From where?

23 A.  **From New York and we have had other victims travel from**

24 **other locations.**

25 Q.  From New York.

1       Did they travel from -- the AUSA based on the indictment

2   proffered that a victim traveled from somewhere -- she didn't

3   say where -- to the Hamptons.  And I don't think where she

4   traveled from, from the Hamptons is necessarily in the

5   indictment, if I remember correctly.

6       So do you know where they came from to go to the Hamptons?

7   A.  **They came from the Long Island Railroad.**

8   Q.  The Long Island Railroad?

9   A.  **Uh-huh.**

10  Q.  And what part of Long Island did they come from?

11  A.  **I am not sure.  I am not from New York.  I believe it was**

12  **in Queens.**

13  Q.  In Queens.  So they traveled within New York State,

14  correct?

15  A.  **Correct.**

16  Q.  And during the course of your investigation -- by the way,

17  this conspiracy is for a period of eleven years, correct?

18  A.  **Correct.**

19  Q.  From 2000 -- approximately in or about 2010 to in or about

20  2021, correct?

21  A.  **Correct.**

22  Q.  So that means the last act that is alleged as part of the

23  conspiracy occurred in 2021, correct?

24  A.  **Correct of what we know.**

25  Q.  Do we know what month in 2021 -- sorry.  Not we.

1    Are you aware of what month in 2021 the alleged last act
2  that was a part of this conspiracy occurred?
3  A.   **I have interviewed multiple women.  So I would have to go**
4  **back to my notes.  I don't have that with me now.**
5  Q.   You interviewed multiple women.  How many women have you
6  interviewed?
7  A.   **Approximately 40.**
8  Q.   You interviewed 40.
9    And it is an eleven-year conspiracy that occurred over
10  eleven years, correct?
11  A.   **Correct.**
12  Q.   And so based on the approximate dates in the indictment the
13  last act occurred in 2021, which is almost four years ago,
14  correct?
15  A.   **Correct.**
16  Q.   Now, during the course of your investigation, did you
17  interview any women who told you that they had friendly contact
18  with any one of the Defendants after an alleged rape?
19  A.   **Yes.**
20  Q.   So they did.  So there are women who had -- and you don't
21  have to name them -- like victim number three.
22    There are women who claim now that they have been raped,
23  but in text messages they nice conversations with the
24  Defendants, correct?
25  A.   **The women were within the same social circles, yes.**

1  Q.  But they were texting the -- one of the individual

2  Defendants -- sorry.

3      The text messages was between the woman and one of the

4  Defendants, right?

5  A.  **Are you referring to victim three.**

6  Q.  Yes, victim three.

7  A.  **I haven't seen those text messages.**

8  Q.  Well, then let me make it -- I'm sorry.  I didn't mean to

9  cut you off.

10  A.  **That's okay.**

11  Q.  Okay.  Then generally between --

12          THE COURTROOM DEPUTY:  Sir?

13          MR. WILLIAMS:  I'm sorry?

14          THE COURT:  Can you use the --

15          MR. WILLIAMS:  I'm sorry.  I tend to wander.

16          THE COURTROOM DEPUTY:  Yes.

17          MR. WILLIAMS:  My apologies.

18          THE COURTROOM DEPUTY:  I'm sorry.  The sound system

19  cannot pick you up.

20          MR. WILLIAMS:  That's my mistake.  I'm sorry.

21          THE COURTROOM DEPUTY:  Thank you, sir.

22  BY MR. WILLIAMS:

23  Q.  What I am asking -- if I am not being clear enough.  I

24  apologize.

25      Many of the women who you interviewed, after an alleged

1  rape, had text messages with one or more of the Defendants,

2  correct?

3  A.  **I have not seen these text messages.**

4  Q.  You have not?

5  A.  **I cannot recall, no.**

6  Q.  You have not.

7     Have you imaged these women's phone?

8  A.  **We have not.**

9  Q.  You have not.

10    So you haven't taken a look to see whether or not these

11 women had friendly discourse and text messages with any one of

12 the Defendants and most importantly, my client, Tal Alexander?

13 A.  **I have not seen any messages after the assault.**

14 Q.  All right.  Now in this eleven-year -- well, let me just go

15 back to something.

16    You have not seen any, but the investigation, during the

17 investigation you haven't imaged any of these women's phones,

18 correct?

19 A.  **We have not imaged anyone's phones.**

20 Q.  To check whether or not there are text messages or e-mails

21 on those phones, which corroborate their account of what

22 occurred, correct?

23 A.  **That's not correct.  We have some messages that women have**

24 **provided, but we have not imaged their phones.**

25    Are you saying a search warrant?

1  Q.   I am saying have you searched, all the women who you

2  interviewed, phones?

3  A.   **Some of the women that we have interviewed have provided**

4  **messages, yes.**

5  Q.   But have you searched those phones?

6  A.   **No, we have not searched those phones.**

7  Q.   Now, it is an eleven-year conspiracy, correct?

8  A.   **Correct.**

9  Q.   And the investigation has been going on for how long?

10 A.   **Approximately 20 years.  I'm sorry --**

11 Q.   The investigation?

12 A.   **The investigation has been going on since June of 2024.**

13 Q.   And it covers the eleven-year period, correct?

14 A.   **Correct.**

15 Q.   And is it fair to say that based on the superseding

16 indictment, at this particular point in time, there are only

17 two victims that you have identified in the superseding

18 indictment over an eleven-year period?

19 A.   **Yes.**

20 Q.   Now, are you aware that the fact that there was a criminal

21 investigation into my client and his brothers was published in

22 the Wall Street Journal in early July of 2024?

23 A.   **I am aware.**

24 Q.   And that was shortly after, about a month after the

25 investigation, the criminal investigation concerning my client,

1  started, correct?

2  A.   **Correct.**

3  Q.   Now since July, early July I believe -- I will just say

4  this.  I believe the date --

5          THE COURT:  You walked away from the microphone.

6          MR. WILLIAMS:  Oh, I'm sorry.

7          THE COURT:  So what happens is, if you want to get a

8  recording of the hearing --

9          MR. WILLIAMS:  Yes.

10          THE COURT:  -- then it will be hard for the --

11          MR. WILLIAMS:  I will stay put.  My apologizes.

12          THE COURT:  Okay.

13          MR. WILLIAMS:  Again, the second time.

14  BY MR. WILLIAMS: .

15  Q.   So what I was going to ask is this.

16      Are you aware that the Wall Street Journal article

17  announcing that there was a criminal -- I'm sorry -- reporting

18  that there was a criminal investigation was dated July 8th of

19  2024?

20  A.   **I was not aware of a date.**

21  Q.   But you remember something from early July, don't you?

22  A.   **Possibly, yes.**

23  Q.   Now, are you aware that also the New York Times and

24  Bloomberg, Bloomberg Publications, also reported around the

25  same time that there was a criminal investigation by the

1  federal authorities into my client?

2  A.  **Yes.**

3  Q.  Okay.  And again, you are since June you have been the lead

4  agent on this case; is that correct?

5  A.  **Correct.**

6  Q.  And you have conducted what you would -- you conducted a

7  detailed investigation, correct?

8  A.  **Yes.**

9  Q.  And obviously, you looked into my client Tal Alexander,

10 correct?

11 A.  **Correct.**

12 Q.  Now, from any time, let's say when that Wall Street Journal

13 article appeared and reported the fact that there was a

14 criminal investigation, until the time my client was arrested

15 on Wednesday -- Mr. Alexander is my client.

16     Until the time Mr. Alexander was arrested on Wednesday, do

17 you have any evidence that demonstrates that he was making

18 plans to leave the country?

19 A.  **I do not.  I don't know what he was thinking.**

20 Q.  But do you have any evidence -- let me ask it this way.

21     Do you have any evidence that he was traveling much more

22 frequently around the world after the Wall Street Journal

23 reported the criminal investigation?

24 A.  **I do not, but your client has access to boats which he can**

25 **leave at any time.**

1   Q.   No, I understand.

2        But did you, during your investigation, discover that he

3   was traveling more frequently to different locations around the

4   world after the Wall Street Journal article, reporting the

5   criminal investigation, came out?

6   A.   **No, I don't have that information.**

7   Q.   You don't.

8        Okay.  And do you have any, due to your investigation of

9   his phone or other phones, do you have any indication based

10  on --

11           MR. WILLIAMS:  let me withdraw and rephrase.

12  BY MR. WILLIAMS:

13  Q.   Based on your review of all the documents that you have

14  seen in this case, did you see anything, any documents,

15  e-mails, texts that led you to the conclusion, okay, that he

16  was making plans to leave the country?

17  A.   **No.**

18  Q.   And by the way, when he was arrested on Wednesday of this

19  week -- I think that is December 11th.

20       When he was arrested the FBI couldn't find him at first,

21  correct?

22  A.   **That's not correct.**

23  Q.   You thought he was in New York, didn't you?

24  A.   **He was in New York, yes, but then he traveled to Miami.**

25  Q.   And then you found him and you went to his father's home,

```
 1  correct?
 2  A.   We did not.  The FBI did not go to his father's home.  We
 3  had a Task Force go to his father's home.
 4  Q.   So law enforcement agents went to his father's home,
 5  correct?
 6  A.   Correct.
 7  Q.   And are you aware that he walked outside the his father's
 8  home and he surrendered himself?
 9  A.   Correct.
10  Q.   Now, let me ask you this.  Are you certain --
11          MR. WILLIAMS:  Withdrawn.
12  BY MR. WILLIAMS:
13  Q.   I believe during the proffer, if my recollection serves me
14  correctly, that it was mentioned that Mr. Alexander and his
15  brothers have a private jet.
16      Is that your understanding?
17  A.   To the proffer, no, that's not my understanding.
18  Q.   Well --
19  A.   They do not have their own private jet.
20  Q.   They don't have their own private jet, correct?
21  A.   Correct.
22  Q.   And in the indictment -- and did you see the letter that
23  was sent to Judge Reid and Judge Caproni?
24  A.   I have not seen a letter.
25  Q.   Okay.  As you sit here today, where is it that my client
```

 1  has strong ties to another nation in the world?

 2  A.  **Your client travels to Israel, yes.**

 3  Q.  He travels to Israel, correct?

 4  A.  **Correct.**

 5  Q.  And it is your understanding that my client is Jewish,

 6  correct?

 7  A.  **Correct.**

 8  Q.  And he is a person of means.  And when I say means, he is a

 9  person with wealth, correct?

10  A.  **Correct.**

11  Q.  And based on these ties to Israel and his wealth, you are

12  concluding that he is a flight risk, correct?

13  A.  **Correct.**

14  Q.  Now let me ask you something.

15       There is a fairly significant Jewish population in the

16  United States, correct?

17  A.  **Correct.**

18  Q.  There is a fairly significant Jewish population in Florida,

19  correct?

20  A.  **Correct.**

21  Q.  And there is a fairly significant Jewish population in

22  Miami, correct?

23  A.  **Correct.**

24  Q.  And we will just stick with Miami for a second.  There is a

25  good number of a --

1    MR. WILLIAMS:  Withdrawn.

2  BY MR. WILLIAMS:

3  Q.   There are a good number of people of the Judaic faith in

4  Miami who have wealth, correct?

5  A.   **I am not sure.  I am not from Miami.**

6  Q.   You are not familiar?

7  A.   **No.**

8  Q.   Let's spread it out to the United States.

9    In the United States there are many wealthy Jewish people,

10  correct?

11  A.   **Correct.**

12  Q.   And many of these wealthy Jewish people are armed

13  supporters of Israel, correct?

14  A.   **I'm not sure.  I can't give you that information.**

15  Q.   Just on your general life experience do you have any

16  knowledge of that?

17  A.   **I don't.**

18  Q.   Are you aware that many Jewish people, whether they are

19  wealthy or not, travel to Israel?

20  A.   **Yes.**

21  Q.   They do, right?

22  A.   **Correct.**

23  Q.   They go to places like Kabbutz, correct?

24  A.   **Yes.**

25  Q.   They travel to Tel Aviv, correct?

1 A.   **Correct.**

2          THE COURT:  Mr. Williams?

3          MR. WILLIAMS:  Yes.

4          THE COURT:  I just want to say that sounds a lot like

5 argument than questions for this agent.

6          MR. WILLIAMS:  That's fine.

7          THE COURT:  You will want to move along.

8          MR. WILLIAMS:  I will wrap this line of questioning

9 up.  Okay.  Certainly, Your Honor.  I'll stop there.

10 BY MR. WILLIAMS: .

11 Q.   Now, since the investigation was announced in the Wall

12 Street Journal on or about or in or about early July of 2024,

13 are you aware that this client, my client, Mr. Tal Alexander,

14 has taken any steps to intimidate or threaten any witnesses?

15 A.   **Your client has threatened some witnesses, yes.**

16 Q.   He has threatened who?

17 A.   **Some of our witnesses that have come forward.**

18          MR. WILLIAMS:  So let me have -- may I approach the

19 witness?  First may I mark this as Defense Exhibit Number Two,

20 please?

21          THE COURT:  As long as you show it to the Government

22 first.

23          MR. WILLIAMS:  Sorry.

24          THE COURT:  Yes, go ahead.

25          MR. WILLIAMS:  Could I Borrow another clip?

1         THE COURTROOM DEPUTY:  Sure.

2         MR. WILLIAMS:  Thank you.  Thank you very much.

3         THE COURTROOM DEPUTY:  You're welcome.

4   BY MR. WILLIAMS:

5   Q.  You can hold this for a second.  I'm going to tell you

6   which page.

7   A.  **All right.**

8   Q.  You can start looking at it if you want.  Take your time

9   and look at it.  I really only have one question.

10  A.  **You have a specific question as to a page number?**

11  Q.  Yes, sure.  You could go to page number 7.

12      And I'm looking, just so maybe it will save you some time,

13  after the discourse of the text message I am looking at the

14  paragraph that starts:

15      'And even when the victims did complain.'  You can read

16  that to yourself, if you would.

17      Have you familiarized yourself with the letter?

18  A.  **Yes.**

19  Q.  Based on your review of the letter does it mirror much of

20  the information in the indictment?

21  A.  **Yes.**

22  Q.  And is it consistent with your understanding of the

23  evidence that you have uncovered during the investigation?

24  A.  **Yes.**

25  Q.  And I would just ask you -- I am going to just point this

1    out and I am going to read this paragraph from Defense

2    Exhibit Two:

3         "And even when victims did complain, Defendants took steps

4    to stop victims from reporting.  The Government is aware, for

5    instance, of at least one occasion which Tal and Oren filed a

6    police report alleging harassment against a woman who had

7    described being forcibly digitally penetrated by Tal while Oren

8    was in the room."

9         Do you see that sentence?

10   A.   **Yes.**

11   Q.   Very serious allegation, correct?

12   A.   **Correct.**

13   Q.   And is that one of the few examples that you have of Tal

14   Alexander, I guess, of threatening somebody?

15   A.   **Yes.**

16   Q.   And he threatened somebody by filing -- by going to the

17   police and filing a report for harassment, correct?

18   A.   **Correct.**

19   Q.   And the other example in that paragraph is that he also

20   threatened a victim with a defamation lawsuit if the victim did

21   not stop telling people that he and Oren had sexually assaulted

22   her.

23        Do you see that?

24   A.   **Yes.**

25   Q.   That is another example of trying to intimidate a witness,

 1  in your opinion, correct?

 2  A.  **Correct.**

 3          MR. WILLIAMS:  Okay.  If I may have one second, Your

 4  Honor.  I think I'm almost done.

 5          THE COURT:  You may.

 6          MR. WILLIAMS:  Your Honor, I don't have anything

 7  further, thank you very much.

 8          Thank you, Agent Atwood.

 9          THE WITNESS:  Thank you.

10          THE COURT:  Wait.  Let me find out if there is any

11  redirect.

12          MS. ASTIGARRAGA:  Just briefly, Judge.

13          THE COURT:  Okay.

14          MS. ASTIGARRAGA:  Thank you, Your Honor.

15                          REDIRECT EXAMINATION

16  BY MS. ASTIGARRAGA:

17  Q.  Agent, I want to talk to you a little bit about foreign

18  travel.  Counsel asked you about whether or not the Defendant

19  has traveled to Israel.

20          Do you recall that?

21  A.  **Yes.**

22  Q.  And he indicated that the Defendant is a Jewish person.  To

23  your knowledge, how frequently has the Defendant traveled over

24  to Israel?

25  A.  **I don't have it with me in front of me, but he has traveled**

1   **there recently.**

2   Q.   Is it one occasion or is it multiple occasions?

3   A.   **Multiple occasions.**

4   Q.   And was that the only foreign location that the Defendant

5   has traveled to?

6   A.   **No.**

7   Q.   Where are the other locations that the Defendant has

8   traveled to?

9   A.   **The Bahamas.**

10  Q.   And when he has traveled to the Bahamas, how is it that the

11  Defendant traveled there?

12  A.   **By boat.**

13  Q.   And when you say boat, what kind of boat?

14  A.   **A yacht.**

15  Q.   Can you be a little --

16  A.   **A yacht.**

17  Q.   Okay.   Thank you.

18       And when he travels in the air, what is the common mode of

19  transportation that the Defendant uses?

20  A.   **A jet.**

21  Q.   Is it a commercial jet or is it a private jet?

22  A.   **Private.**

23  Q.   Counsel asked you about the times that the Defendant was,

24  quote, making plans to flee the country.

25       Based on your knowledge of this investigation, does the

1  Defendant, quote, make plans in advance when he travels on

2  every instance?

3  A.  **No.**

4  Q.  Okay.  So what is the usual course that the Defendant does

5  when he travels?

6  A.  **Sometimes last minute.**

7  Q.  And when you say last minute, what do you mean by that?

8  A.  **The same day that they are going to travel.**

9  Q.  Okay.  So, for example, in this instance the Defendant was

10 arrested here in Miami, right?

11 A.  **Correct.**

12 Q.  Was that the original plan to arrest him here?

13 A.  **No.**

14 Q.  And why is it that the FBI had to arrest him here in Miami,

15 Florida?

16 A.  **Because last minute he flew to Miami.**

17 Q.  Okay.  Do private jets have the same kind of manifest that

18 a commercial jet would otherwise be required to report?

19 A.  **No.**

20 Q.  And additionally, counsel also asked you during

21 cross-examination about whether only two victims were, quote,

22 identified in the eleven-year conspiracy and I want to make

23 sure we are clear for the Court.

24     Have only two victims been identified in this case?

25 A.  **No.**

1  Q.   Approximately how many victims have been identified in this

2  case?

3  A.   **Forty.**

4  Q.   Okay.  So your reference to the two victims is actually

5  just the two substantively charged trafficking counts; is that

6  right?

7  A.   **Correct.**

8  Q.   All right.  But, Count One, that conspiracy, that relates

9  to 40 women?

10 A.   **Yes.**

11 Q.   Were you present for the interview of these 40 victims?

12 A.   **Not all 40, but most of them.**

13 Q.   If you had to give a percentage for the interviews that you

14 were present for, what percentage would that be?

15 A.   **98 percent.**

16 Q.   98 percent.

17      Of those 98 percent of the victims that you were there for

18 those interviews, was there ever an instance where that victim

19 appeared not to be credible?

20 A.   **No.**

21 Q.   Was there ever an instance where the stories did not seem

22 consistent with other victims?

23 A.   **No.**

24 Q.   Does every single victim, all 40, do they know each one

25 another?

1  A.  **No.**

2  Q.  Do they come from different states?

3  A.  **Yes.**

4  Q.  Did they span different times?

5  A.  **Yes.**

6  Q.  Different incidents?

7  A.  **Yes.**

8  Q.  And their stories were the same?

9  A.  **Yes.**

10  Q.  What kind of unit are you a part of in the FBI?

11  A.  **Child Exploitation and Human Trafficking.**

12  Q.  In your training and experience in this particular squad,

13  have you had an opportunity to interview other trafficking

14  victims not included in this case?

15  A.  **Yes.**

16  Q.  Approximately how many times?

17  A.  **Over a hundred.**

18  Q.  Counsel asked you whether in this case there was any

19  instance where a victim later had friendly contact with one of

20  the brothers.

21      Do you remember that?

22  A.  **Yes.**

23  Q.  Okay.  As you sit here today, are you aware of whether or

24  not that happened?

25  A.  **No.**

1  Q.   Okay.  But in your training and experience as an agent who

2  investigates these kinds of trafficking, is it common for

3  sexual assault victims to remain in contact with their abusers?

4  A.  **Yes**.

5          MR. WILLIAMS:  Objection.  But I was late.  Sorry.

6          THE COURT:  The basis of the objection?

7          MR. WILLIAMS:  Is she an expert witness as to rape

8  kind of victims?

9          THE COURT:  Okay.  I think that is a fair question.

10         MS. ASTIGARRAGA:  She is testifying as to her training

11 and experience, Your Honor.  He asked whether or not there was

12 friendly contact between other victims.

13         So I would submit that the agent can certainly testify

14 as to her training and experience as a trafficking agent for

15 three and-a-half years with the FBI.

16         THE COURT:  Objection overruled to the extent that she

17 is discussing her own training and her own experience.

18 BY MS. ASTIGARRAGA:

19 Q.   Counsel asked you about whether the last act in this case

20 occurred in 2021.

21         Do you remember that?

22 A.  **Yes**.

23 Q.   And it was approximately four years ago?

24 A.  **Yes**.

25 Q.   And to be clear, the evidence in your case, it spans that

1  this conduct occurred for approximately how long?

2  A.  **Twenty years.**

3  Q.  So for two decades?

4  A.  **Yes.**

5         MS. ASTIGARRAGA:  I have nothing further at this time.

6         MR. WILLIAMS:  I have, if I may?  Two questions.

7         THE COURT:  Okay.

8         MR. WILLIAMS:  Actually three questions.

9         THE COURT:  You may.

10        MR. WILLIAMS:  I will be brief.  Thank you, Your

11  Honor.

12                    RECROSS EXAMINATION

13  BY MR. WILLIAMS:

14  Q.  Two decades, right, is what she said this alleged activity

15  by -- alleged criminal activity -- by my client existed,

16  correct?

17  A.  **Correct.**

18  Q.  The only time period alleged in the indictment is July 2010

19  to July 2021 in terms of the conspiracy, correct?

20  A.  **Correct.**

21  Q.  And you have interviewed 40 victims, correct?

22  A.  **Approximately.**

23  Q.  I'm sorry.  I cut you off.

24     You interviewed approximately 40 victims, right?

25  A.  **Correct.**

1  Q.   And I will say alleged victims.

2       And you, in your opinion, found them credible, correct?

3  A.   **Yes.**

4  Q.   But in a substantive indictment there are only two victims

5  identified, correct?

6  A.   **Correct.**

7  Q.   I am talking about the substantive counts of the

8  indictment, correct?

9  A.   **Correct.**

10 Q.   And do you have any knowledge or are you aware that Mr.

11 Alexander, since the Wall Street Journal article came out until

12 let's say Tuesday of this week, had only traveled between New

13 York and Miami and had never left the country?

14 A.   **I am not aware of that, no.**

15       MR. WILLIAMS:  I have nothing further.

16       THE COURT:  All right.  Thank you.

17       You may step down, Agent.  Thank you.

18       THE WITNESS:  Thank you.

19       THE COURT:  Government, do you have any further

20 witnesses?

21       MS. ASTIGARRAGA:  No further witnesses, Your Honor.

22 Just argument.

23       THE COURT:  Okay.  And Mr. Williams, any witnesses?

24 Any evidence to present?

25       MR. WILLIAMS:  No, just argument.

 1           THE COURT:  Just argument.

 2           Just argument.  Okay.  So we will let the Government

 3    proceed with her argument and then Mr. Williams, you can

 4    respond.

 5           MS. ASTIGARRAGA:  Thank you, Your Honor.

 6           Your Honor, detention is clearly appropriate and we

 7    are joining in the recommendation of Pretrial Services that the

 8    Defendant be detained pending trial.

 9           It is appropriate for generally three main reasons.

10    Number one, the weight of the evidence and the hefty prison

11    sentence that the Defendant likely faces, which includes a

12    15-year minimum mandatory as it relates to any three of the

13    counts charged in this case, are specifically enumerated

14    factors that weigh heavily in favor of detention.

15           Second, the egregious offense conduct and the clear

16    danger that the Defendant poses to the community also weighs

17    heavily in favor of detention.

18           And finally, the fact that the Defendant is a serious

19    flight risk when considering his international contacts, his

20    immense resources and his ability to flee.

21           As the Government noted previously a presumption

22    applies in this case pursuant to 18 United States Code

23    3142(e)(3)(d) because the offenses fall under Chapter 77,

24    including 1591, and the max term of imprisonment related to

25    those offenses is life.

1          Additionally, other subsections of the detention

2   statute also supports that the detention is appropriate here

3   and that includes because of the particular statutes charged,

4   as well as the penalty that he faces.

5          I first want to talk about the weight of the evidence

6   in this case.  Here, detention is appropriate when considering

7   the strength of this particular case.

8          The Government's evidence is comprised of victim and

9   witness statements related to approximately 40 different

10  victims; 40 different rapes, 40 different incidents of sexual

11  violence.

12         The evidence includes electronic evidence that

13  includes photos and videos.  Many that are sexually explicit.

14  Many that depict the Alexander brothers engaging in sexual

15  activity with the victims.

16         It includes communications, as Your Honor heard from

17  the proffer, between the Defendant and his brothers discussing

18  group sex, discussing providing and piling women with drugs in

19  order to get them to have sex with them and for arranging for

20  their travel from other states to meet them at whatever lavish

21  sex parties that they were trying to arrange.

22         As it relates to the digital evidence , the Government

23  is also in possession of iCloud evidence related to the

24  Defendant and his brothers, their social media accounts, the

25  dating application accounts, all of which corroborate the

1 victims' statements.

2          Additionally, many of the victims' accounts strongly

3 corroborate each other.  They account similar experiences of

4 sexual violence at the hands of the Alexander brothers,

5 including the Defendant, despite occurring in different

6 settings, in different states, and at times over different

7 decades.

8          Your Honor, I think that this is key and why does this

9 matter?  It matters because the fact that so many victims

10 spanning all these different groups have similar accounts to

11 one another.  Despite frequently having no connection supports

12 that they are telling the truth.

13          Because there is power in numbers.  Because where

14 there is smoke there is fire and the Defendant's apartment or

15 his waterfront property at this point is completely ablaze.

16          When we turn next to the danger to the community,

17 detention is clearly appropriate when we consider the facts and

18 the circumstances in this particular case.  Not only against

19 the women that the Defendant has victimized over over the past

20 20 years, or the eleven years of this particular conspiracy,

21 but also to the community at large.

22          Here the indictment charges this eleven-year

23 conspiracy, but the evidence has supported that this has been

24 going on for two decades.  And what we know, based on this

25 investigation, is that the Defendant has engaged in repeated

1   and serial conduct.

2          So as to not mince words here, the Government submits

3   and we have charged the Defendant that he and his brothers are

4   serial rapists.  That is what the indictment has charged.

5          The investigation has revealed that they have

6   violently raped dozens of women that the Government is only

7   currently aware of related to victims who are brave enough to

8   have come forward to date.

9          Given that the news has only broke of their arrest

10  this week, there is already a new wave of potential victims who

11  have come forward and we anticipate the number of victims to

12  continue to grow.

13         What this serial conduct demonstrates is that no

14  combination of bond conditions can reasonably assure the safety

15  of the community.

16         What this serial conduct demonstrates is that the

17  Defendant remains a danger.  Not only to those 40 victims that

18  we are aware of to date, that he either raped himself or was

19  complicit in the assault, but that he remains a danger to the

20  women of any community that the Court were to send him back to.

21         Now the Court obviously you should be concerned with

22  the facts of this case related to the Defendant's flagrant

23  disregard for consent and because clearly the Defendant is not

24  someone who is going to follow orders.

25         Here, several victims indicated that they were drugged

1  on the night of their assaults.  They reported that the drugs

2  affected them in a way that they were physically incapacitated.

3  That they were unable to move during these encounters.  That

4  they were not able to consent to what happened to their bodies

5  that night.

6       Several victims reported that they screamed for the

7  Defendant, or his brothers, or whoever else's turn it was to

8  rape them that night to stop.  But that these protests that

9  every time they told them to stop were completely ignored.

10      And I understand that the Court can issue an order,

11  but I would submit that there is a greater autonomy that we are

12  talking about here.  There is a greater order and this is a

13  woman's autonomy to her own body.

14      And that in and of itself was rejected by this

15  Defendant and his brothers and all the people that they

16  conspired with to rape women over the course of eleven years.

17      Many victims reported that the rapes were so violent

18  that they were worried they were going to be seriously harmed

19  or killed if they protested any further.  They were terrified

20  then and they remain terrified now.

21      And putting aside the obvious that this conduct was

22  inherently dangerous that they had a flagrant disregard for

23  their autonomy.

24      The other fact that the Court should consider is that

25  the Defendant and his brothers drugged these women without any

1  concern for how those drugs would have affected their body.

2  Whether they would have overdosed.  Whether they would die as a

3  result of what they ingested.  None of it was a concern.

4         The sexual violence alleged here in this indictment

5  and as the Court heard from the proffer, it all occurred behind

6  closed doors; in the Defendant's apartments, in his homes, in

7  hotel rooms and in other private settings.

8         It all occurred to what likely would be a setting that

9  the Court would send the Defendant back to even if the

10  step-down least restricted bond would be considered home

11  detention.

12         Even if the Court considered releasing the Defendant

13  to the comfort of his luxurious apartment in New York or his

14  waterfront property here, nothing prevents him from committing

15  the same kind of crimes that he has committed in these kinds of

16  locations before.

17         The Court would be sending him back to, in many

18  instances, was the scene of the crime.

19         Your Honor has heard these facts.  There are multiple

20  victims here.  I would submit to this Court that if there is

21  just one victim, if there was just a single count that was

22  alleged in this indictment that said that this Defendant

23  drugged her, that said that this Defendant then forcibly raped

24  her, I would submit that under the detention statute, the

25  detention would be appropriate.

1      THE COURT:  Let me ask a question and I am just
2  assuming you are going to get to it.
3      There was some testimony about threatening the
4  witnesses.
5      MS. ASTIGARRAGA:  Yes, Your Honor.
6      THE COURT:  I want to get some more detail on that.
7      MS. ASTIGARRAGA:  Absolutely, Your Honor.
8      And so that relates and I think that is how detention
9  might be appropriate under the obstruction section of the
10  statute which is 3142(f)(2)(b).
11      And here, Your Honor, it relates to the fact that
12  there was a victim, as the Court heard from the proffer, who
13  indicated -- who began to tell people that the Defendant had
14  forcibly digitally penetrated her.
15      And at the time that this happened, the Defendant and
16  his brother then filed a police report claiming that she was
17  harassing him.  And when she continued to tell her friends that
18  the assault had occurred, then he told her he was going to
19  threaten her with a defamation lawsuit.
20      And Your Honor, I think counsel's point when they were
21  discussing a police report and the defamation lawsuit is if
22  this is really happening, then why are they reporting it?
23      But, Your Honor, I would actually argue that when they
24  are taking this kind of conduct, they are just using a weapon
25  that is at their disposal.

1          Because for this Defendant what his weapon is, is his

2    money.  He uses it to lure women in over to these luxurious

3    apartments and he uses it just to show them just how powerful

4    he is.

5          And when someone has the audacity to voice what

6    happened to them, he threatens them with a defamation lawsuit.

7    Why?  Knowing full and well that a multimillionaire is likely

8    going to be out-gunned to some victim who is talking about the

9    assault that she incurred.

10          So I would actually submit, Your Honor, the fact that

11    he is telling her he is going to file a defamation lawsuit

12    against her is one more example of this Defendant weaponizing

13    his wealth.

14          If convicted on any of the charges in this particular

15    case, the Defendant faces a 15-year minimum mandatory, but as

16    the Court heard, he is currently guidelined at life

17    imprisonment.

18          And this minimum mandatory, this hefty prison sentence

19    is especially for someone who has never served any period of

20    incarceration.  It certainly incentivizes flight.

21          But surely for a person whose risk of going from the

22    life of the rich, privileged, and famous, to one who is

23    confined to a 70-square-foot cell block.

24          Of course, the thought that he is going to prison for

25    a minimum of 15 years, if convicted on any of these counts, and

1   possibly life, certainly he is not going to stand and face

2   these charges.

3         Turning next to the Defendant's significant wealth,

4   this is a person with access to millions of dollars, private

5   jets and yachts.

6         You heard from the agent that when he travels it is at

7   a moment's notice.  It is actually why he is sitting here in

8   the Southern District of Florida today because it was not a

9   planned trip.

10         It is not a usual thing where he goes on to Price Line

11   and decides where he is going to go.  He has the kind of wealth

12   that they can just decide any given day, in a matter of hours,

13   we are headed off to this international location.

14         When they go to the Bahamas we are going there by a

15   yacht.  And there is not the same kind of manifest regulation

16   that you heard from the agent as there would be on a particular

17   commercial flight.

18         Additionally, Your Honor, the Defendant does have

19   significant international ties.  The fact that his parents are

20   Israeli, the fact that he has traveled back to Israel, the fact

21   that we have conferred with OIA and they have indicated that if

22   he does flee there , which has happened in the past, that they

23   are not going to be able to extradite him back and that is not

24   a sure thing.

25         The fact that we are potentially not going to be able

1  to extradite him surely is another cause for concern and

2  demonstrates that he is a risk of flight.

3         And so, accordingly, Judge, in light of all the

4  factors that the Court is required to consider, in light of the

5  fact that there is a presumption in this case, in light of the

6  fact that there are 40 different victims who have demonstrated

7  to the agents and who have come forward and said I was

8  violently raped and experienced this sexual violence, the

9  Government believes that pretrial detention is appropriate.

10        And the Court should follow the recommendation that

11  has been given by Pretrial Services.

12        THE COURT:  All right.  Thank you, Counsel.

13        Mr. Williams.

14        MR. WILLIAMS:  Yes, Your Honor.

15        The indictment itself, the superseding indictment, the

16  second opportunity is no one is challenging the severity of the

17  allegations.  We are, however, challenging the veracity of

18  them.

19        And this alleged conspiracy in the allegations of the

20  indictment and even the letter that was submitted in court, are

21  very specious.  They are very inflammatory.

22        And if you notice counsel's argument just now was

23  based on continuing to repeat these serious allegations.  And

24  they are serious, but they warrant -- there are a lot of cases

25  that have serious allegations and it does not mean that they

1 | are true, A.

2 |      And B, the focus for bail for whether or not there

3 | should be pretrial detention is risk of flight and danger to

4 | the community.  And on those two grounds the presentation by

5 | the Government is woefully inadequate.  It does not meet it.

6 |      Again, I am not minimizing or marginalizing the

7 | severity of these allegations, but I am noting that you have an

8 | eleven-year conspiracy and only two victims.  Having been a

9 | former federal prosecutor up in the Southern District,

10 | conspiracy is a wonderful tool for prosecutors.

11 |      Okay.  If it was what they are saying at this

12 | particular juncture -- and I don't want to argue the merits so

13 | much, but if it was what they were saying at this particular

14 | juncture, you would have many more substantive counts and not

15 | just two victims, but that is really not the issue here.

16 |      The issue is because -- and I am just pointing this

17 | out because much of her presentation was based on repeating the

18 | allegations in the indictment and the letter and not focusing

19 | on risk of flight or danger to the community.

20 |      And let me just say this Your Honor -- and by the way

21 | and I will get to it, she didn't answer your question with

22 | regard to danger to the community witness tampering.  I think

23 | she mentioned the defamation.

24 |      And if I am wrong the record will correct me.  She

25 | mentioned the defamation and then pivoted back to repeating the

1  severity of the allegations.  The question, from my viewpoint,
2  was not answered.
3          But going to the presumption that is here, as I
4  understand it, the presumption with regard to sex trafficking
5  imposes on Defendant a burden of production while burden of
6  persuasion remains with the Government.
7          That is *United States v. Mercedes* 254 F.3d 433 at 436,
8  Second Circuit 2001:
9          "A Defendant can satisfy this burden by presenting
10 evidence that he does not pose a danger to the community or a
11 risk of flight.
12         If the Defendant presents some evidence satisfying his
13 or her burden, the presumption favoring detention does not
14 disappear entirely, but remains a factor to be considered."
15         So I would submit to this Court that the presumption
16 based on the presentation by the Government and based on the
17 cross-examination has been vitiated.  It is a factor that you
18 can consider.
19         And let's go into the factors here.  Mr. Alexander
20 found out that there was a criminal investigation as a result
21 of a -- let me back up for a second.
22         This case has been Mr. Alexander and his brothers have
23 been regularists (phonetic) in every major news publication for
24 the last, I guess, five months since early July.  Actually
25 before that because I think it was around that time last five

1 months.

2      So everyone knows about the case.  Everyone knows

3 about the criminal investigation.  And yet, he is between when

4 the Wall Street Journal and others and the Times and Bloomberg

5 came out and until he was arrested, he didn't travel

6 internationally.  He didn't go anywhere.  He went between New

7 York and Miami. That he is all he did.

8      And the reason why I asked those questions concerning

9 making plans, okay, I understand he can leave quickly, but

10 there is no evidence that he left quickly anywhere on a regular

11 basis to different venues in the world.

12      Okay.  Which would be an indicia that he might be

13 making some plans to skip out.  That is not here.  New York and

14 Miami and they have nothing to refute it.

15      He and his family have very, very strong ties to the

16 community.  Here in Miami and they have ties to New York.  They

17 are well-known.  They grew up here.  He went to high school

18 here.  He grew up here.  He is not going anywhere.

19      And I am going to get to the potential bail package

20 that I think might work as part of this presentation.  And you

21 will see that the family means business in supporting their son

22 and he means business in seeing this through and proving he is

23 innocent.

24      But let me say something else.  Mr. Alexander got

25 married a year ago.  He has a two-week-old baby at home.  That

1  is why his wife isn't here today because the baby was sick all

2  night.

3          Now I am not trying to engender sympathy from Your

4  Honor, but if he is like most guys, most men, and subscribes to

5  the happy-wife happy-life doctrine, okay, he is not going to be

6  traipsing around the world with a two-week-old or a couple of

7  weeks old and his wife.

8          His wife, in her own right, is established and

9  successful and is not going to uproot herself.  So I will just

10  put that fact before Your Honor.

11          He has no Israeli passport at all.  They do not own a

12  private jet.  I mean, lots of people have access to private

13  jets.  Lots of people have access to -- lots of people in his

14  family in his stratosphere, they have the opportunity to do

15  that.  That does not mean that they are going to flee anywhere.

16          So, you know, with regard to the risk of flight, it is

17  nonexistent.  Where is he going?  And listen, you correctly

18  stopped me from pursuing a line of inquiry because I guess I

19  was getting a little argumentative.

20          But the argument, based on a foundation that I was

21  just trying to set through the agent is simply this.  There are

22  enough wealthy Jewish people in the United States, in Florida,

23  and in Miami with very strong ties to Israel who are armed

24  supporters who go their regularly.  So that if any one of them

25  were arrested at any time, this argument, this specious

1  argument would be potentially applicable.

2          They have strong ties to Israel.  They are wealthy.

3  It should be pretrial detention.  That is nonsense and that is

4  what I was getting at when I was going through that

5  questioning.

6          Just briefly, danger to the community, okay, it is the

7  Government's letter.  They wrote -- let me just see.  How many

8  pages is that letter?  Let me just see.  The letter is

9  double-spaced.  The letter to you and Judge Caproni is twelve

10 pages.

11         And in that twelve pages, if you review, there is not

12 that much on witness tampering and intimidation, which we all

13 know is what Courts most recently have focused on, let's say,

14 in other cases in other jurisdictions.  It is nonexistent here.

15         The last act here alleged is 2021.  That is A.  So

16 there has been nothing going on for almost the last four years.

17 And the examples that they cite in their letter is as follows.

18 He threatens someone with a defamation suit if they kept saying

19 he sexually assaulted them.  That does not sound like witness

20 tampering.

21         That is not my understanding of witness tampering, or

22 intimidation, or obstruction of justice is.  And the other

23 thing is they he did is he went to get a police report and

24 brought it to the police attention that he was being harassed

25 by someone who was accusing him of sexual assault.

1          That is, again, in my respectful opinion, an example

2    of witness intimidation or tampering that rises to the level of

3    anywhere needed to fulfill that prong of Your Honor's bail

4    analysis.  And so I point out those two things.  There is just

5    nothing there.

6          And I will just move now to the -- and again, I will

7    reiterate one point.  Nothing has happened for the last almost

8    four years as far as -- I don't think they established that

9    anything has happened since 2021.  Nothing has happened since

10   there was a report that there was a criminal investigation.

11         But let me move to the bail package and I will point

12   out -- and this is not at all binding on this Court at all.

13   But his two brothers, who obviously are charged in this

14   indictment, appeared in front of Judge Lody Jean in state court

15   who found the following.

16         And I will read this into the record.  Again, it is

17   not binding.  I just would like Your Honor to consider it.  It

18   says:

19         "Judge Lody Jean this morning found based upon the

20   initial Judge's bond along with the agreed upon pretrial

21   release conditions, I have made the finding that the conditions

22   set forth and agreed upon by Defendant and State are reasonable

23   to assure appearance by Defendants and are reasonable to assure

24   no risk to the community.

25         And the personal surety is a blood relative who stands

1  to lose his substantial property.  Based upon all these

2  factors, I find that PTR, pretrial release, shall assure

3  Defendants appearance."

4        That is as to his brothers and I just wanted you to

5  consider that.

6        Now, if you want to see the bail package that was

7  arranged, it is substantially lower than what I am going to

8  present to you right now.  Okay.  His family, okay, and him are

9  willing to put up a total of 115 million dollars in equity.

10       That is their building.  That is their houses.  That

11  is everything to ensure his appearance.  So if he goes bye-bye

12  they lose all of that; 115 million dollars in equity and it

13  does not stop there.

14       THE COURT:  Okay.

15       MR. WILLIAMS:  He could move in with his wife and

16  child and him could move in with his parents.  Okay.  So there

17  is no -- with his parents in their house.  Okay.  Live in their

18  house and subject himself to home detention and GPS monitoring.

19       So that is another condition.  And whatever else we

20  can work out with the Court and with the Government, but that

21  is a significant commitment because if he skips out, if he

22  flees and violates the condition, he and his family are going

23  to lose everything.

24       So there is a way that there can be bail conditions

25  that meet, as the prosecutor, the severity of the allegations

1  here.  Notwithstanding the mandatory life sentence.

2  Notwithstanding any of that.  He is not -- he is still innocent

3  until proven guilty.

4        So there is a bail package that can satisfy this that

5  will put everybody at risk if he goes anywhere.  Okay.  And in

6  addition, I will just point out he has a wife with a good

7  career and a two-week old child.  So where is he going?

8        I will stop there, Your Honor.  Thank you very much

9  for your time.  I have one other request that I forgot.  If

10 whatever reports that this FBI, in addition to the 3500

11 material, whatever report that she might have filled out we

12 would request as well.

13        And I will stop there.  Thank you very much, Your

14 Honor.

15        THE COURT:  Okay.  So let me make sure I understand

16 the bond package that you are suggesting.  It is 115 million

17 dollars.  Explain that.  And who are the co-signors on this

18 bond?

19        MR. WILLIAMS:  It would be his parents, himself.

20        And let me just pull this up.  It involves his

21 parents' home.  Do you want me to put the address on the

22 record?

23        THE COURT:  No need.

24        MR. WILLIAMS:  His parents' home.  His office building

25 .  His own house, which is worth about 30 million.  I think

 1  there is a 22 million dollars of equity in it.

 2          THE COURT:  And are these items in this district?

 3          MR. WILLIAMS:  Yes, they are.

 4          THE COURT:  Okay.

 5          MR. WILLIAMS:  They are in Miami.

 6          THE COURT:  Okay.

 7          MR. WILLIAMS:  You know, surrender passport.  Home

 8  detention with GPS monitoring.

 9          THE COURT:  Is his wife going to be a co-signor as

10  well?

11          MR. WILLIAMS:  Yes, everyone is joining.  Everyone

12  will be signing.

13          Let me tell you.  I omitted one thing.  I believe

14  there is like ten or twelve, ten plus community people in the

15  courtroom today, or if they are not here today, they are around

16  who are in part of the synagogue and part of the tight knit

17  community that Tal, Mr. Alexander is a part of who will be

18  willing, many of them will be willing to sign too.

19          So there are a lot of people who would stand to lose a

20  lot if he --

21          THE COURT:  I see a lot of people standing behind you.

22          MR. WILLIAMS:  Yes, here they are.

23          THE COURT:  Okay.

24          MR. WILLIAMS:  There is a lot of support for him.

25          THE COURT:  All right.  Thank you very much.  You can

1   all sit.

2          MR. WILLIAMS:  I'm sorry, Your Honor.  And he has no

3   prior arrests.

4          THE COURT:  I understand.

5          MR. WILLIAMS:  Okay.  Is that fine?  Can I stop there?

6          THE COURT:  So the co-signors would be his parents,

7   himself, and his wife?

8          MR. WILLIAMS:  Yes.

9          THE COURT:  And there is going to be 115 million

10  dollars extending to their home, their office, and his home?

11         MR. WILLIAMS:  Yes.

12         THE COURT:  GPS monitoring.

13         MR. WILLIAMS:  Can you wait?  I just need to check one

14  thing.

15         THE COURT:  Go ahead.

16         MS. ASTIGARRAGA:  And Your Honor, prior to the --

17         MR. WILLIAMS:  I'm sorry.

18         MS. ASTIGARRAGA:  -- the Court making its ruling if

19  the Government could have an opportunity to respond.

20         THE COURT:  Of course.

21         MR. WILLIAMS:  And Your Honor, so it is 115 million

22  dollars all total and it also, portions of it, involve his

23  brothers' homes as well, too.

24          Okay.  So they have put -- I'm sorry?  Everyone is

25  pledging their homes for each other.  So if anyone walks out on

```
 1   the other, they are going to lose everything.

 2          I'm sorry.  Do you have any other questions, Your

 3   Honor?

 4          THE COURT:  Not at this time.

 5          MR. WILLIAMS:  Thank you very much.

 6          THE COURT:  Okay.  So let me get back to the

 7   Government.

 8          So I understand that one of the concerns was safety to

 9   the community.

10          MS. ASTIGARRAGA:  Yes, Your Honor.

11          THE COURT:  And if I understood the response to my

12   question, your concern was that he might threaten some of these

13   women with lawsuits?

14          I want to make sure I understand your concern for the

15   community.

16          MS. ASTIGARRAGA:  Absolutely, Your Honor.

17          It would be the Government's position, in addition to

18   threatening additional victims and witnesses that are already

19   present in this case, right?  That we already have here.  The

20   ones who have already come forward.

21          Like he did when there was a victim who voiced what

22   had happened to her when he threatened her with a defamation

23   lawsuit.  It would also be the Government's position that he

24   remains a physical danger to the women of this community.

25          I would note, counsel made a reference that he has so
```

 1  many ties here.  In fact, he went to high school here.  Well,

 2  get what, Judge?

 3          His very first victim that we are aware of came from

 4  high school.  The very first time that we know that the

 5  Defendant was engaged in gang rape was at that high school.

 6          There are victims that are here located in the

 7  Southern District of Florida that have been victimized at the

 8  hands of the Defendant and his brother.  There are victims that

 9  are located in the Southern District of New York that have been

10  victimized at the hands of the Defendant.

11          And these are all closed door offenses.  So what does

12  that mean?  It means that should the Court grant him home

13  detention, well, that is the same exact setting that these

14  violent rapes actually occurred and we are supposed to

15  believe --

16          THE COURT:  So you are suggesting that there are women

17  who would, knowing how public this is right now, still go to

18  his home?  I am concerned.  I want to make sure I understand

19  your argument.

20          MS. ASTIGARRAGA:  Yes, Your Honor.

21          To the extent that there is any kind of people who are

22  staffed by the Defendant's home.  To the extent that there are

23  women there.

24          To the extent he has access to cell phones being able

25  to lure the same kinds of victims that he did in this case

1  repeatedly over and over for eleven years, Your Honor.

2       The Government would submit that he remains a danger

3  to people because of this significant sexual violence that has

4  occurred here.

5       I would also like to note that as it relates to the

6  state case, the state case against the Defendant's twin

7  brothers cover a much smaller scope than what is covered here

8  in this federal indictment.

9       Additionally, this was a parallel investigation that

10  was being done with the State Attorney's Office as well as FBI

11  located in New York.

12       So the fact that they agreed to a bond knowing full

13  and well that there was a federal detainer under a presumption

14  statute that the moment that his brothers are, quote unquote,

15  released from state jail, they still remain in custody awaiting

16  the same kind of hearing that is happening before Your Honor

17  today.

18       And the Government also intends to seek pretrial

19  detention as it relates to them.  So I don't think that the

20  Court should consider the fact that the state jail entered this

21  bail package knowing full and well that this is a parallel

22  investigation.  That the parties are working together in

23  concert.

24       Additionally, as it relates to a risk of flight,

25  Judge, I understand that this is an enormous number.  I think

1  the fact that the Defendant usually uses his wealth to commit

2  these crimes.

3          And he is now using it here to say, look at this,

4  115 million dollar bail package, let me out.  Is another

5  example of the Defendant in terms of using his wealth something

6  that he is a very small subset of people who has access to and

7  he is trying to get bail at this point.

8          But I would submit, Judge, that he is facing a life

9  sentence.  Why is he going to stay here and face these charges

10 regardless of the amount of money that goes out the doors for

11 friends or family if he knows that it could potentially end

12 with him behind bars.

13         If we consider of other cases that are similarly

14 situated, I would actuality point the Court to the Sean Combs

15 case who is known as the monicker Diddy.  That case is actually

16 very similar to the allegations that are asserted here today.

17         And in that particular case, Mr. Combs actually went

18 to the U.S. Attorney's Office and said let me know what is

19 going to happen.

20         And in that instance, pretrial detention was ordered

21 given the span of time, the amount of sexual violence, and the

22 amount of victims that they know there.

23         And finally, Judge, when considering the kind of

24 conspiracy that we have here, it is not the agent's job to

25 decide on various charging decisions.  The fact that there are

1   two substantively charged counts in a conspiracy does not

2   render the fact that there is just two victims here.

3          As this Court is well aware when a conspiracy is

4   charged, the Government is allowed to assert any of the

5   incidents of violence that happened during that particular

6   conspiracy date range.

7          So what that means is that conspiracy period, and as

8   the agent testified and it was covered in the Government's

9   proffer, covers 40 different victims.  That is what the agent

10  has suggested here today.  That is what she has testified to.

11         And so, the Court should consider that there are 42

12  victims that are listed in that particular indictment and that

13  that number potentially still is growing.

14         And so for all those reasons, Judge, we do think that

15  detention is appropriate here.  Not only because of risk of

16  flight.  Not just because we have confirmed with OIA that if he

17  flees we can't get him back.  Not only because he has the

18  access and ability to do so, but because he remains a danger to

19  the community.

20         And I would submit under the obstruction subsection,

21  while it is not the crux of the Government's argument, I would

22  submit the fact that the time that a victim came forward and

23  said this happened to me that his reaction is I am going to

24  file a defamation lawsuit with you, with my six lawyers that

25  are here in the courtroom and my multimillion dollar bank

```
 1   account, certainly is a way of trying to assert power and
 2   control, which is exactly what this case is about.
 3            THE COURT:  Would there be a way to bar him from
 4   filing such lawsuits at least during the pendency of the
 5   criminal case and would that be a condition that might prevent
 6   that type of witness intimidation?
 7            MS. ASTIGARRAGA:  Your Honor, perhaps the Court could
 8   impose that particular condition to the extent that the
 9   Defendant cannot use his extreme network that he has to reach
10   out to victims.  To the extent that he cannot use his millions
11   upon millions of dollars to otherwise intimidate them
12   elsewhere, Judge.
13            I don't think that it would be sufficient.  I don't
14   think -- and we provided an example to Your Honor and that
15   includes that.
16            However, the danger I think here is also the sexual
17   violence.  I do not think it is reasonable to believe that
18   somebody who has been a serial rapist for 20 years by the
19   Government's allegations is going to suddenly have their come
20   to Jesus moment and just stop.
21            And now we are just not going to do that because
22   suddenly we are sitting here in a federal courtroom.  I don't
23   think this kind of perpetrator, the kinds of crimes that are
24   being alleged here that that is going to stop this kind of
25   pervasive conduct; the kind of conduct that we have heard about
```

1 | from 40 plus victims.

2 |       MR. WILLIAMS:  Your Honor, may I respond?

3 |       THE COURT:  Thank you, Counsel.

4 |       Yes, of course.

5 |       MR. WILLIAMS:  Your Honor, as I view counsel's

6 | arguments, she is bootstrapping based on the severity of the

7 | allegations, which no one is contesting.  We are contesting the

8 | veracity of them.

9 |       She is bootstrapping and she keeps going back to that.

10 | Listen, I can assure you, okay, that as his counsel I am going

11 | to make -- the only thing that we are going to be focused on is

12 | this case.

13 |       Again, filing defamation suits is not -- I don't view

14 | that or I submit that I don't view that as witness tampering.

15 | However, that is the last thing on anyone's mind here.

16 |       Okay.  And quite frankly, to file any suits given the

17 | adverse publicity, they are going nowhere.  So that does not --

18 | only reason why that becomes significant because in the

19 | twelve-page letter they pointed to two things.

20 |       We are going to sue you for defamation, which is

21 | common and it happens all the time when people accuse people of

22 | doing wrongdoing and the other person feels it is not true and

23 | filing a police report.

24 |       It is significant at that point in a letter because

25 | they don't have anything else.

1          The other thing that --

2          THE COURT:  So do I hear you saying that you are

3    willing to add that as a provision that he would not be filing

4    any police reports or lawsuits during the pendency of --

5          MR. WILLIAMS:  Yes, he is not touching anyone.

6          Yes, we will craft language that assures that because

7    that is not what the focus is going to be.

8          As she has so astutely pointed out he is facing life.

9    He is fighting for his life.  Okay.  But notwithstanding his

10   wealth -- and it seems like there is a presumption here.  I get

11   especially my upbringing, which was not as affluent.  Okay.  It

12   wasn't bad, but it wasn't like this, right?

13         I get that some people may look at wealthy people and

14   say, hey, they can just buy their way out of anything with four

15   lawyers.

16         I get that and this the way she -- the way the AUSA is

17   portraying that, okay, it is almost like she is holding and it

18   is prejudicing him in a bail application that deals with risk

19   of flight and witness tampering, which they really have not

20   been able to substantiate and those are the two factors that

21   counts here.

22         The Combs case and I mean that is different.  I didn't

23   even reference the Combs case, specifically.  When I say in

24   terms of determining pretrial detention -- I mean the

25   allegations are similar, I understand, but in terms of, well,

1  that indictment is far bigger and longer if my recollection

2  serves me well.

3         But the point -- and she raised the Combs case, but

4  the point of that case and the other cases is that the Court

5  will look at things like what danger to the community, witness

6  tampering, and the risk of flight.

7         And here there is no evidence that they presented of

8  danger to the community.  They keep going back to the fact of

9  the severity of the allegations.

10        And again, I just point out, he won't have his own

11 home as part of the bail package he is going to move in with

12 his parents, his wife and kid.  How embarrassing and

13 humiliating that might be, but he is going to be there at the

14 house.

15        So how is he going to carry out or continue to carry

16 out this scheme or any intimidation?  He is going to be watched

17 very carefully.

18        All I am saying is we are not trying the case here

19 today.  All we are trying to do is determine whether or not

20 there is a way to assure he does not flee the jurisdiction and

21 is not a danger to the community , which are the two most

22 salient factors in this analysis.

23        And based on the record that we have so far there is a

24 way of doing it.

25        Thank you, Your Honor.

```
 1          THE COURT:  All right.  I am going to take a few
 2   minutes recess and then I will be back.
 3          UNIDENTIFIED MALE SPEAKER:  Your Honor, may the Public
 4   Defender be excused?
 5          THE COURT:  Oh, of course, sir.  I didn't mean to make
 6   you sit there the whole time.
 7          THE COURTROOM DEPUTY:  All rise.  The court is in
 8   recess.
 9   (Recess.)
10          THE COURT:  All right.  Please be seated.
11          So I have reviewed the file again and the arguments of
12   both sides.  We started with the fact that this is a
13   presumption case where the Defendant is facing a sentence that
14   could very well be a life sentence.  It is a very serious
15   matter and I think all agree that the allegations are
16   incredibly serious.
17          The Court is required to, even though there is a
18   presumption, still hold the Government to its burden.
19          With respect to danger to the community, I will find
20   that there are conditions and some combination of conditions
21   that could alleviate the danger to the community.  So that is
22   not my area of concern.
23          My area of concern is risk of flight.  And I will be
24   very frank with you, Mr. Williams.  When I weigh the concerns
25   about risk of flight, I believe that the Government has met
```

1   their burden.

2          While the circumstances here show that he does not

3   have a record in the past, the weight of the evidence is quite

4   strong as I see the affidavit from the agent and the evidence

5   that have been presented to me.

6          The nature and the circumstances of the offense are

7   quite serious.  This family has, however, extensive resources

8   that I am not, at this point, aware of exactly where the

9   115 million dollars is substantial for them as it is for some.

10         He clearly has the financial resources to flee if he

11   chose to do so.  And in fact, home confinement and GPS

12   monitoring has proven in the past to not be foolproof.  So that

13   does not reasonably assure the Court in this case that he will

14   appear for his hearings as required.

15         So I am going to find that he should be detained at

16   this point based upon risk of flight.

17         If the Government could prepare an order on the AO

18   form.

19         MS. ASTIGARRAGA:  Yes, Your Honor.

20         THE COURT:  In Word and send that to my office, I

21   would appreciate it.

22         Thank you very much.

23         MR. WILLIAMS:  Thank you, Your Honor.

24         THE COURTROOM DEPUTY:  Your Honor, do we have the

25   removal?

```
1              THE COURT:  Removal, I wonder if you are going to
2    waive removal or will we have a removal hearing?
3              MR. WILLIAMS:  No, we are waiving it.
4              THE COURT:  Okay.  Would you want to do that today?
5              MR. WILLIAMS:  Yes, Your Honor.
6              THE COURT:  Okay.
7              THE COURTROOM DEPUTY:  Put his name.
8              MR. WILLIAMS:  Put his name?  I'm sorry.
9              THE COURTROOM DEPUTY:  Yes.
10             MR. WILLIAMS:  Okay.  Do I need to fill out anything?
11             THE COURTROOM DEPUTY:  Yes, the identity.
12             THE COURT:  You can check the box on there if he is
13   waiving removal identity hearing.  And if you want a few
14   minutes to discuss it with him before I talk to him about, you
15   go ahead.
16             MR. WILLIAMS:  I'm not sure, Your Honor.  It says the
17   identity hearing and production of the warrant.
18             THE COURT:  I think that would be the production of
19   the warrant from the Southern District of New York --
20             MR. WILLIAMS:  Okay.
21             THE COURT:  -- that you are waiving that.
22             MR. WILLIAMS:  Okay.  Does he need to sign it?
23             THE COURT:  Yes.  So if he understands it and wants to
24   sign it and I will do a colloquy to make sure that he
25   understands it as well.
```

1      THE COURTROOM DEPUTY:  Thank you.

2      MR. WILLIAMS:  Thank you.

3      THE COURT:  Okay.  Mr. Alexander, I do have to ask you

4  a few questions directly to make sure that you understand the

5  waiver that you just signed.

6      THE DEFENDANT:  Yes, Your Honor.

7      THE COURT:  So, first of all, you do have the right to

8  what is called an identity or a removal hearing.

9          The purpose of the hearing is simply to make sure that

10  you are the same Tal Alexander that is listed or charged in the

11  indictment out of New York.

12          So the Government would then have to prove by a

13  preponderance of the evidence that you are the same person who

14  is named in the indictment.

15          Now, you can waive that hearing and proceed to defend

16  your case in New York.  So my first question is, do you

17  understand the waiver that you have signed?

18      THE DEFENDANT:  Yes, Your Honor.

19      THE COURT:  And have you had sufficient time to

20  discuss that waiver with Mr. Williams?

21      THE DEFENDANT:  Yes, Your Honor.

22      THE COURT:  Okay.  So having done so, I will find that

23  this is a knowing and voluntary waiver of your right to the

24  removal hearing.

25          And I will sign the removal order and so your case

1    will be transferred to New York and you can go ahead and defend

2    yourself there.  Okay.

3              THE DEFENDANT:  Yes, Your Honor.

4              THE COURT:  All right.  Very good.

5              Anything else on this matter today?

6              MR. WILLIAMS:  No, Your Honor.  Thank you, Your Honor,

7    and happy holidays.

8              THE COURT:  Thank you.  And you as well, sir.

9              THE COURTROOM DEPUTY:  All rise.  Court is in recess.

10             (Thereupon, the proceedings concluded.)

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1

2

3                            CERTIFICATE

4

5          I hereby certify that the foregoing transcript is an

6  accurate transcript of the audiotape recorded proceedings in

7  the above-entitled matter.

8

9

10

11
   12/17/24                    Bonnie Joy Lewis,
12                     Registered Professional Reporter
                           CASE LAW REPORTING, INC.
13                        7001 Southwest 13 Street,
                         Pembroke Pines, Florida 33023
14                             954-985-8875

15

16

17

18

19

20

21

22

23

24

25